In re William B. WILSON a/k/a Willie B. Wilson Individually and d/b/a Wilson Ranches, Debtor.

William B. WILSON, Plaintiff,

v.

TXO PRODUCTION CORP., Defendant.

Bankruptcy No. 584–50146.
Adv. No. 584–5117.

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

Feb. 13, 1987.*

---

* This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

Thomas J. Griffith, Lubbock, Tex., for Wilson.

Tim Gideon, Lynch, Chappell, Allday & Alsup, Austin, Tex., for TXO.

John E. Leslie, Shannon, Gracey, Ratliff & Miller, Fort Worth, Tex., for Unsecured Creditors Committee.

## MEMORANDUM OF OPINION

JOHN C. AKARD, Bankruptcy Judge.

### Procedural History

On June 21, 1984, William B. Wilson, a/k/a Willie B. Wilson, Individually and d/b/a Wilson Ranches, filed for protection under Chapter 11 of the Bankruptcy Code. On November 14, 1985, Mr. Wilson, as Debtor-in-Possession (Wilson), brought this adversary proceeding against TXO Production Corp. (TXO), seeking an accounting and turnover of income withheld by TXO as operator of oil and gas leases in which Wilson owns interests. Wilson asserted such withholding is a preferential transfer pursuant to 11 U.S.C. § 549 or, in the alternative, a fraudulent transfer pursuant to 11 U.S.C. § 548. He sought to recover not only transfers made to TXO within 90 days of the filing of the bankruptcy petition but, characterizing TXO as an insider, also transfers which occurred within one year of the filing of the petition as well as postpetition funds withheld.

TXO responded that the funds it held were cash collateral of its operator's lien on the Debtor's interests in the wells operated by TXO. TXO asserted that it had the right to withhold the funds and that such withholding did not constitute transfers, either preferential or fraudulent, from the Debtor.

Subsequently, TXO filed a Motion for Relief from Automatic Stay to allow it to foreclose its operator's lien against the various interests of Wilson in certain oil and gas wells, on the grounds that Wilson had neither paid his expenses on the wells nor paid adequate protection. Hearing was held to the Court on June 4, 1986, at which time TXO argued that the various operating agreements between TXO and Wilson constituted executory contracts which Wilson had neither assumed nor rejected.

## Facts

Interests in oil and gas wells fall into two broad general categories: royalty interests and working interests. The royalty interest (often simply referred to as royalty) is the right to receive a share of the production of the well, free of any obligation to pay expenses in connection with that production. A working interest is the right to receive a share of the production of the well, but carries with it the obligation to pay a pro rata portion of the expenses of the well. In effect, the royalty owners receive their payments without having to bear any of the costs (and, in theory at least, as compensation for owning the property initially), while the working interest owners must pay the entire costs of operating the well in exchange for their share of the production. Typically there are a number of working interest owners and it is quite common for them to enter into an operating agreement which provides for one of them (the operator) to operate the properties for the benefit of both the working interest and royalty owners. Typically the royalty owners have no say in naming the operator. There is no requirement that the operator be one of the working interest owners, but it is the customary practice. The working interest owners who are not the operator of the well are referred to as non-operating working interest owners or non-operators.

TXO is both the operator and a working interest owner in the Noelke 8–1, the Arco 75–4, the Thompson P–1, the Thompson P–2, the Bankhead #1, and the Bankhead #A–1 wells located in various counties in Texas. Wilson is one of a number of non-operating working interest owners in the wells. He also owns a royalty interest in them.

Under the operating agreements in effect between the parties, TXO controlled operations on the leases on which the wells were situated and billed the non-operators for their proportionate share of expenses for the preceding month. Every month TXO sent the non-operators checks for their proportionate share of the proceeds of oil and gas sold from the wells. In short, the arrangement was a typical oil and gas operation. When Wilson failed to pay his share of prepetition operating expenses, TXO applied funds attributable to Wilson's interests in the wells to cover those expenses. After Wilson filed his Chapter 11 petition on June 21, 1984, TXO continued to set aside the proceeds which represented Wilson's interests in the wells. TXO insists that it has liens on the funds in question pursuant to the operating agreements and, in addition, asserts that the operating agreements must be characterized as executory contracts which Wilson must assume or reject.

Wilson alleges that, whether or not the operating agreements are executory contracts, the seizure of the proceeds of Wilson's interests in the wells constituted illegal transfers before the petition was filed and violations of the automatic stay after the petition was filed. Wilson further claims that the funds (now held by TXO) attributable to Wilson's interests in the wells do not represent cash collateral since TXO is not a secured creditor.

## Executory Contract

■ The first question to be determined by the Court is whether an operating agreement is an executory contract. An executory contract is one under which the parties' obligations to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. *In re Sun Belt Electrical Constructors, Inc.*, 56 B.R. 686, 688 (Bankr.N.D.Ga.1986); Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 458–62 (1973). While no attempt has been made to define the term "executory contract" in the Bankruptcy Code, the legislative history adopts the principle of mutuality in saying that the term "generally includes contracts on which performance remains due to some extent on both sides." 2 *Collier on Bankruptcy* ¶ 365.02, [15th ed. 1985]; see also *Lubrizol Enterprises, Inc. v. Richmond*

*Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1045 (4th Cir.1985) *cert. denied,* —— U.S. ——, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986). The Court holds that both Wilson and TXO have continuing obligations under the operating agreements so long as oil or gas are produced from the wells in question and, thus, the operating agreements are executory contracts.

As executory contracts, the operating agreements between TXO and Wilson are subject to the provisions of 11 U.S.C. § 365 which govern the time for curing defaults. Section 365(a) states that, subject to the Court's approval, the Trustee (in this case, the Debtor-in-Possession, Wilson) may assume or reject any executory contract. Section (b)(1) provides that the Trustee may not assume unless, at the time of assumption, he (A) cures or provides adequate assurance that he will promptly cure such default, (B) compensates or provides adequate assurance that he will promptly compensate the other party to the contract for any actual pecuniary loss he has suffered from the default and (C) provides adequate assurance of future performance under the contract.

■ Section 365(d)(2) provides that "the trustee may assume or reject an executory contract ... at any time before the confirmation of a plan." In the instant case no plan has been confirmed. While the Court may order the contract assumed or rejected within a specified period of time where requested to do so by a party to the contract, TXO has made no such request. Therefore, if Wilson assumes these executory contracts, he must cure his default, but he need not cure it until he assumes. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 529, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984).

### Operator's Lien

Several operating agreements, each relating to different leases, were introduced into evidence at the hearing. Each agreement contained an operator's lien similar to the one in Article VII of the operating agreement dated March 6, 1978:

> Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area and a security interest in its share of oil and or gas when extracted and its interest in all equipment to secure payment of its share of expense, together with interest thereon ... To the extent that Operator has a security agreement under the Uniform Commercial Code of the State, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. In addition, upon default by any Non-Operator in the payment of its share of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such Non-Operator's share of oil and gas until the amount owed by such Non-Operator has been paid.

One of the agreements was recorded in the Oil and Gas Records of Reagan County, Texas on June 13, 1984, within 90 days of the filing of the Bankruptcy Petition (June 21, 1984). Thus, to the extent that the recording adds enforceability to the operator's lien contained in the operating agreement, it is a preference and is clearly voidable under 11 U.S.C. § 547(b). Another agreement was recorded in the Oil and Gas Records of Reagan County, Texas on July 11, 1984, subsequent to the filing of the Bankruptcy Petition. The recording of this latter agreement, to the extent that it asserts an operator's lien, is in violation of the automatic stay provisions of 11 U.S.C. § 362(a)(4).

Once oil and gas are produced, they become personal property. *United States v. Texas Eastern Transmission Corp.,* 254 F.Supp. 114, 118 (W.D.La.1965); *Onyx Refining Co. v. Evans Production Corp.,* 182 F.Supp. 253, 256 (N.D.Tex.1959); *Phillips Petroleum Co. v. Mecom,* 375 S.W.2d 335 (Tex.Civ.App.—Austin 1964, no writ). The operating agreement attempts to give the operator a lien on the oil and gas produced (in addition to a lien on the oil and gas in

place) for the non-operating working interest owner's share of expenses.

The Trustee-in-Bankruptcy (the Debtor-in-Possession in a Chapter 11) has the rights of a bona fide purchaser for value under 11 U.S.C. § 544(a)(3) and the rights of a hypothetical attaching lien creditor under § 544(a)(1). In order for the operator's lien to be effective against a bona fide purchaser, or an attaching lien creditor, one of the following must be done:

a. Proper recording or filing of the lien outside the preference period.

b. Constructive notice to the world of the interest of the lien claimant.

c. Possession of the collateral.

Except for the two attempts at recording described above, it was admitted that TXO did not record its operator's lien in the real estate records, nor file a financing statement concerning its operator's lien in the Uniform Commercial Code records.

■ TXO asserts that its possession of the lease as operator was notice to the world of its operator's lien. Although, as TXO asserts, the granting of a lien to an operator in an operating agreement may be customary in the oil industry, such customs do not constitute legally enforceable rights, nor do they give constructive notice to a prospective purchaser or attaching lien creditor.

TXO, as an owner of part of the working interest, is a co-tenant with Wilson as an owner of a part of the working interest. *Shaw & Estes v. Texas Consolidated Oils*, 299 S.W.2d 307 (Tex.Civ.App.—Galveston 1957, writ ref'd n.r.e.). Possession by one co-tenant does not give notice of equitable rights as against another co-tenant. 16 Tex.Jur.3d, *Cotenancy and Joint Ownership*, § 25 (1981). One co-tenant is entitled to possession of the entire property so long as another co-tenant does not demand possession. *Southern Pine Lumber Co. v. Hart*, 161 Tex. 357, 340 S.W.2d 775 (1960). Our research has not revealed any Texas case holding that possession of the property by one co-tenant is notice to the world that the co-tenant in possession is claiming a lien against the other co-tenant's interest. In fact, possession consistent with record title does not constitute notice of an unrecorded claim. *Dallas Land & Loan Co. v. Sugg*, 237 S.W. 955 (Tex.Civ.App.—Austin 1922, writ ref'd).

■ As between the parties, a lien is valid even though it is not properly perfected. This is true because the financing statement is not the operative document which creates the security interest between the parties; it is merely a public notice which directs one to further information. J. White and R. Summers, *Uniform Commercial Code* at 918 (2d ed. 1982).[1] The Court understands that the purchasers of the oil and gas made payment to TXO as the operator. It was then the operator's obligation to pay the royalties, the expenses, and the working interest owners. Thus, to the extent that TXO had possession, prepetition, of proceeds of production relating to Wilson's working interest, TXO was a secured party in possession of the collateral. As the secured party in possession of the collateral, it was entitled to apply those proceeds to Wilson's obligations for operating expenses.

Wilson argues that the payments made prepetition were setoffs. Setoff is a common law right which was specifically granted to TXO in the operating agreement and, although it operates very much like a lien, it is not technically a lien. With regard to the prepetition proceeds of Wilson's working interest, TXO exercised its lien rights, rather than its rights of setoff. Thus the improvement of position test in connection with setoffs under 11 U.S.C. § 553(a)(3) is not applicable.

■ Wilson asserts that TXO is not entitled to setoff because of the trustee-type relationship between the operator and the non-operating working interest owners, citing *Reserve Oil, Inc. v. Dixon*, 711 F.2d 951, 953 (10th Cir.1983). The *Reserve Oil* Court construed Oklahoma law. In Texas, it has been held that an operating agree-

---

1. *See also* TEX.PROP.CODE ANN. § 13.001 (Vernon, 1984).

ment does not create a partnership or agency between the operator and the non-operators. *Luling Oil & Gas Co. v. Humble Oil & Refining Co.*, 144 Tex. 475, 191 S.W.2d 716, 722 (1945); *U.S. Truck Lines v. Texaco, Inc.*, 337 S.W.2d 497 (Tex.Civ.App.— Eastland 1960, writ ref'd). A mere contract does not give rise to a fiduciary duty between businessmen. *Consolidated Gas & Equipment Co. v. Thompson*, 405 S.W.2d 333 (Tex.1966). Based on these authorities, it seems clear that Texas Courts would hold that an operating agreement does not create a trustee-type relationship between an operator and the non-operators.

■ Wilson further asserts that the prepetition payments were preferences and argues that TXO is an insider such that the preference period should be one year prior to the date of the filing of the bankruptcy petition under 11 U.S.C. § 547(b)(4)(B). There is no evidence that TXO was an insider within the definition contained in 11 U.S.C. § 101(28). The one-year preference rule is inapplicable. The 90–day preference rule of 11 U.S.C. § 547(b)(4)(A) also is inapplicable because TXO merely exercised the lien rights to which it was entitled as a secured creditor in possession of the collateral.

■ The exercise of its lien rights by TXO does not give rise to a fraudulent transfer under 11 U.S.C. § 548.

### Prepetition Royalties

■ To the extent that TXO was not paid for Wilson's share of the prepetition operating expenses, TXO's claim would be a general unsecured claim in these proceedings. Wilson asserts that the setoff by TXO of prepetition royalties due him against prepetition operating expenses constituted a preference under 11 U.S.C. § 553(b)(1).

The term setoff implies reciprocal demands existing between the same persons at the same time. *Frost v. DeBogory*, 291 S.W.2d 414 (Tex.Civ.App.—Dallas 1956, no writ). The first requirement of setoff is mutuality of obligation. To be mutual, the debts must be in the same right and between the same parties, standing in the same capacity. 4 *Collier on Bankruptcy* ¶ 553.04[2] (15th ed. 1986); *see also Republic Financial Corp.*, 47 B.R. 766 (Bankr.N. D.Okla.1985). Royalty owners must be paid before any payments are made for well expenses or to the working interest owners. Royalty payments represent the royalty owners' share of production and bear no portion of the operating expenses. TXO's claims against Wilson are for operating expenses. Wilson's entitlement to royalty is an entirely distinct right and he is entitled to it in an entirely different capacity. Thus, the requisite mutuality is missing.

To the extent TXO offset Wilson's prepetition royalties against Wilson's pre- or postpetition operating expenses, such offsets are disallowed. Wilson will be granted a judgment against TXO for such sums which shall bear interest at the judgment rate specified in 28 U.S.C. § 1961 from the date they should have been paid, compounded annually as specified in that statute, and continuing until fully paid.

### Postpetition Production

Clearly, postpetition production, whether as a part of Wilson's working interest or as a part of royalty, cannot be used to offset prepetition obligations to TXO. *Cooper-Jarrett, Inc. v. Central Transport, Inc.*, 726 F.2d 93 (3rd Cir.1984).

### The Twilight Zone [2]

■ What is the status of these operating agreements/executory contracts between the date the petition was filed in this case and the date Wilson accepts or rejects them (the Twilight Zone)? *Sun Belt, supra*, holds the answer to our question. An executory contract is unenforceable against a Debtor-in-Possession who has not yet assumed the contract. *Id.* at 689, (citing *Bordewieck, The Postpetition, Pre-Rejection, Pre-Assumption Status of an Executory Contract*, 59 Am.Bankr.L.J. 197, 199

**2.** This term was suggested by Sheldon Toll of    Detroit, Michigan.

(1985)); *accord, NLRB v. Bildisco & Bildisco, supra.* In *Bildisco*, the United States Supreme Court held that the filing of the petition in bankruptcy means that the executory agreement is no longer immediately enforceable and may never be enforceable again. *Id.* 465 U.S. at 532, 104 S.Ct. at 1199. Further, the *Bildisco* Court held that, since it is unenforceable, the Debtor-in-Possession need not comply with the terms of the contract prior to seeking the Bankruptcy Court's permission to either assume or reject. *Id.*

In Texas, oil and gas in place is part of the real estate. *United States v. Texas Eastern Transmission Corp., supra; Onyx Refining Co. v. Evans Production Corp., supra; Phillips Petroleum Co. v. Mecom, supra.* The working interest owners are co-tenants in the mineral estate. When there is no operating agreement between them, the law of co-tenancy governs their relationship. This law also governs their relationship during the Twilight Zone.

As the producing co-tenant, TXO must spend money necessarily and beneficially in the interest of the owners of the mineral estate. When one co-tenant incurs expenses benefiting the entire property, that co-tenant is entitled to contribution from the other co-tenants in proportion to their respective interests. *City of Grand Prairie v. City of Irving,* 441 S.W.2d 270, 273 (Tex.Civ.App.—Dallas 1969, no writ). The producing co-tenant who develops the oil and gas property may deduct the reasonable expenses of producing and marketing the oil and gas from the proceeds of the production it obtains. *McCurdy v. Harry L. Edwards Drilling Co.,* 198 S.W.2d 609, 612 (Tex.Civ.App.—Galveston 1946, no writ); *Estes v. Texas Consolidated Oils,* 266 S.W.2d 272, 275 (Tex.Civ.App.—Galveston 1954, no writ); *Shaw & Estes v. Texas Consolidated Oils, supra.*

■ The Debtor-in-Possession in a Chapter 11 proceeding has different rights and powers from the prebankruptcy debtor.[3] Thus, a line must be drawn on the date the petition is filed; TXO has a valid claim in these proceedings for operating expenses incurred for Wilson's working interest in the wells up through the day prior to the day the petition was filed. However, with respect to prepetition obligations of Wilson, TXO has no claim to any funds received by TXO on or after the date the petition was filed with respect to Wilson's working interest, even though such funds might represent proceeds from prepetition production. TXO will assert that it is injured by this conclusion because payment generally follows production by 30–90 days. Nonetheless, this is the conclusion the Bankruptcy Code demands and TXO must pursue its claim in these proceedings by the route provided in the Code.

TXO began work as the operating co-tenant on the date the petition was filed. Postpetition operating expenses can be charged against postpetition production *only.* Therefore, TXO may offset Wilson's working interest share of the postpetition operating expenses against Wilson's working interest share of the postpetition production. TXO must furnish an appropriate accounting to Wilson monthly and monthly

---

**3.** The second issue raised by these cases is whether the NLRB can find a debtor-in-possession guilty of an unfair labor practice for unilaterally rejecting or modifying a collective-bargaining agreement before formal rejection by the Bankruptcy Court. Much effort has been expended by the parties on the question of whether the debtor is more properly characterized as an "alter ego" or a "successor employer" of the prebankruptcy debtor, as those terms have been used in our labor decisions. (Citations omitted.) We see no profit in an exhaustive effort to identify which, if either, of these terms represents the closest analogy to the debtor-in-possession. Obvious-

ly if the latter were a wholly "new entity," it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same "entity" which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent the bankruptcy filing.
*NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 527–528, 104 S.Ct. 1188, 1196–1197, 79 L.Ed.2d 482 (1984).

pay him his net share of the postpetition production as it relates to his working interest.

Wilson's royalty interest is another matter. TXO and Wilson are co-tenants only to the extent of their working interests. Royalty must be paid before any distribution is made to working interest owners. Thus, TXO has no right to withhold royalties attributable to Wilson with respect to postpetition production. TXO must account to and pay to Wilson those royalties monthly.

To the extent TXO has not paid Wilson his net postpetition share of the working interest and his postpetition royalties, such sums shall bear interest at the judgment rate specified 28 U.S.C. § 1961 from the date they should have been paid, compounded annually as specified in that statute, and continuing until fully paid. The Court realizes that this will result in different interest rates for amounts which became due in different months, but that is what the statute contemplates.

TXO's Motion to be Relieved from the Automatic Stay is denied because TXO no longer has an operator's lien.

Order accordingly.