**LAKEWOOD PIPE OF TEXAS, INC., Appellant,**

v.

**CONVEYING TECHNIQUES, INC., Appellee.**

No. 01–89–00995–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 22, 1991.

Donald M. Hunt, Lubbock, for appellant.

Joe S. Maida, Houston, for appellee.

Before MIRABAL and DUGGAN, JJ.

## OPINION ON MOTION
## FOR REHEARING

DUGGAN, Justice.

This is an appeal from a bench trial judgment awarding a manufacturer damages in the form of a cancellation charge for partially manufactured goods as a result of the buyer's breach of an oral sales agreement. Appellant's motion for rehearing is granted. We withdraw our earlier opinion, issued on July 3, 1991, and substitute this opinion in lieu thereof.

Appellee, Conveying Techniques, Inc. ("Conveying Techniques"), manufactures and fabricates conveying and material processing equipment. Appellant, Lakewood Pipe of Texas, Inc. ("Lakewood"), processes and sells steel pipe for the oil industry and agricultural irrigation. The two firms operate contiguous plants in Houston and occasionally sell goods and services to each other.

Conveying Techniques sold Lakewood a *manual* hydrostatic testing system in 1979. In April 1984, Conveying Techniques gave Lakewood a written proposal for the construction and installation of an *automatic* system. In May or June of 1984, the presidents of the two firms met at Conveying Techniques' plant, where Conveying Techniques' president, Roy Lee, demonstrated a prototype automated hydrostatic testing system to Lakewood's president, Frank Tybus. Lee testified that Tybus verbally agreed to buy the automated system for the $240,000 purchase price stated in the written proposal, by telling Lee to "go ahead with the project." Tybus denied any such agreement and recalled only expressing an interest in the automated system. Conveying Techniques alleged that the automated system was designed expressly for Lakewood's use.

Conveying Techniques began building the automated system in late 1984. Although Lakewood knew that Conveying Techniques was producing an automated system, Tybus testified for Lakewood that he and his firm did not know the system was being built expressly for Lakewood. On December 10, 1984, Lee wrote Earl Kimbal, Lakewood's general manager, summarizing Conveying Techniques' position regarding the agreement and reminding Kimbal that Conveying Techniques had agreed to start building the automatic system on the condition that all of Lakewood's outstanding receivables would be paid. Lee noted that Conveying Techniques delayed building the system because Lakewood failed to pay, and was concerned that Lakewood would not pay before the system was installed. Lee requested that Lakewood complete payment so Conveying Techniques could build and install the equipment.

As of the date Lee's letter was sent to Lakewood, December 10, 1984, Lakewood was $48,295.07 past due on its account with Conveying Techniques.[1] Lakewood made an additional purchase for $208.01 in January 1985, increasing its indebtedness to Conveying Techniques to $48,503.08. In turn, Conveying Techniques became indebted to Lakewood for a total of $62,672.63. In January 1985, the balance of accounts was in Lakewood's favor by $14,169.55 ($62,672.63 − $48,503.08 = $14,169.55).

---

1. This figure is obtained by deducting both the $80,000 charge in issue and a later charge for $208.01.

Lakewood eventually notified Conveying Techniques in February 1985 that it "would not be in the market for the project." Lee testified that Conveying Techniques stopped construction when Lakewood announced it could not satisfy its creditors. On March 5, 1985, Conveying Techniques invoiced Lakewood for $80,000, "30% of the Contract Sum of $240,000," as "Cancellation Charges" on the automatic system.

Lee testified that he calculated the cancellation charge by "estimation." He believed Conveying Techniques had spent more than $80,000 on the automatic system to this point, although he produced no records of actual expenses. He stated that installation of the unit, for which he had quoted $95,000, had not been started, and that a small amount of work on the system was still incomplete. Lee estimated that Conveying Techniques would "normally" have expended between $125,000 and $135,000 in direct equipment costs from the time it started to the commencement of installation, not including overhead. Lee also testified that Conveying Techniques had pumps and other equipment intended for use in the job, containing approximately 30,000 pounds of steel, still situated at its place of business, for which Lakewood had not been given credit on its account. Lee stated that he could not testify as to what quantity of the materials had been used in the Lakewood project because he had not inventoried the remaining supplies. Lee thought that he could eventually sell some of the parts, although he had been unable to do so in the intervening five years before trial.

Based on this evidence, the trial court made the following findings:

(1) Lakewood entered into an oral agreement with Conveying Techniques to purchase the automated system;

(2) The two companies' usual and customary manner of conducting business was by oral agreement;

(3) Tybus [on behalf of Lakewood] cancelled the order when the system was approximately three-fourths completed;

(4) Conveying Techniques spent approximately $125,000 in construction costs on the project before cancellation;

(5) $80,000 was a reasonable and necessary charge for cancellation of the agreement, based on the cost incurred in constructing the system;

(6) After allowing all offsets, Lakewood owed Conveying Techniques a balance of $65,830.45; and

(7) The automatic hydrostatic pressure testing system was specially manufactured for Lakewood and was not suitable for sale to others in the ordinary course of Conveying Techniques' business.

The trial court allowed Lakewood no credit for pumps and other materials Conveying Techniques retained or used elsewhere.

■ In three points of error, Lakewood alleges (1) the use of an incorrect measure of damages (2) applied to damage findings supported by legally and factually insufficient evidence (3) destroys the basis for damages, attorney's fees, and prejudgment interest.

■ The purpose of damages, including the remedies provided under the Texas Business and Commerce Code, is to place the injured party in as good a position as it would enjoy if the other party had fully performed under the contract. *Stewart & Stevenson Servs., Inc. v. Enserve, Inc.*, 719 S.W.2d 337, 343 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); TEX.BUS. & COM.CODE ANN. § 1.106(a) (Vernon 1968). To place the injured party in that position, damages must be measured by a "legal standard to guide the fact finder" in determining what sum would compensate for the injury. *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex.App.—Dallas 1988), *writ denied per curiam*, 778 S.W.2d 865 (Tex.1989) (citing *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex.1973)). Thus, the facts of each case dictate the correct measure to be applied.

■ Here, Conveying Techniques, as seller, seeks damages for Lakewood's cancellation of the oral contract to manufacture an automatic testing system for Lakewood. We agree with Lakewood that sec-

tion 2.708(b) of the Texas Business and Commerce Code applies[2] to a seller seeking damages for a buyer's breach of a contract to manufacture a specialized piece of equipment that has no market value. This statutory damage formula applies to all cases in which the seller properly discontinues manufacture of goods because of a buyer's breach. *USX Corp. v. Union Pac. Resources Co.,* 753 S.W.2d 845, 848 (Tex.App.—Fort Worth 1988, no writ); *Stewart,* 719 S.W.2d at 343. The damage formula of section 2.708(b) provides for the following calculation:

Profit (including reasonable overhead)

+ incidental damages

+ costs reasonably incurred

− due credit for proceeds of resale

= Total damages for incomplete goods

TEX.BUS. & COM.CODE ANN. § 2.708(b) (Vernon Supp.1991).

This code section is referred to as the "profit formula," and cases of this type are labeled "incomplete goods cases." Anderson, *Damages for Sellers Under the Code's Profit Formula,* 40 Sw. L.J. 1021, 1025 (1986). "[S]ection 2–708(2) is the only appropriate damage formula for incomplete goods sellers." *Id.* at 1034.

Lakewood, the defaulting buyer, produced this formula, and did so for the first time on appeal. A thorough review of the record reveals that section 2.708(b) was never mentioned during the trial. Indeed, Lakewood's motion for new trial states only that the trial court used an incorrect measure of damages, but does not mention this code section. Had the trial court's attention been directed to the relevant statutory provisions, the court would have been able to articulate more precisely the basis for its award.

As plaintiff, Conveying Techniques had the burden of proving with some degree of certainty a factual basis to support the amount of damages awarded. *McCarley v. Hopkins,* 687 S.W.2d 510, 513 (Tex.App.—Houston [1st Dist.] 1985, no writ). Conveying Techniques had the burden to prove each element of recoverable damages. *Superior Trucks, Inc. v. Allen,* 664 S.W.2d 136, 145 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). An award of damages must have factual support in the record, *K–Mart Corp. v. Trotti,* 677 S.W.2d 632, 637 (Tex.App.—Houston [1st Dist.] 1984), *writ ref'd n.r.e.,* 686 S.W.2d 593 (Tex.1985), and must be based on some competent evidence and not on mere conjecture. *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710, 712 (1943); *Nickel v. Snider,* 484 S.W.2d 940, 943 (Tex.Civ. App.—Corpus Christi 1972, writ ref'd n.r.e.). Recovery of damages cannot be based on pure speculation. *Roth v. Law,* 579 S.W.2d 949, 956 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

The record contains insufficient evidence to allow this Court to reconcile the evidence with the elements of the section 2.708(b) damage formula. Because the evidence regarding computation of damages is factually insufficient, we must reverse the judgment of the trial court and remand the cause for a new trial to determine the amount of damages to which Conveying Techniques is entitled, using the damage formula found in TEX.BUS. & COM.CODE § 2.708(b); *Wright Way Spraying Serv. v. Butler,* 690 S.W.2d 897, 898 (Tex.1985); *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401–402 (Tex.1981).

Rule 81(b)(1) of the Texas Rules of Appellate Procedure provides, in relevant part:

**2.** An important limitation on the seller is provided by TEX.BUS. & COM.CODE ANN. § 2.704(b) (Vernon 1968) by requiring the seller to exercise reasonable commercial judgment to determine whether or not to complete manufacture of the goods. Anderson, *A Roadmap for Sellers' Damage Remedies Under the Uniform Commercial Code and Some Thoughts About Pleading and Proving Special Damages,* 19 RUTGERS L.J. 245, 266 (1988). If the goods can be readily resold by completing manufacture and reselling, the

seller will save the buyer the variable expenses incurred in manufacturing the goods up to the time of breach. If on the other hand, it is the seller's reasonable judgment at the time of breach that the goods cannot readily be resold, he should cease manufacture and bring his action under section 2.708(b). *Id.* It is the buyer's burden to show that the seller acted unreasonably. Anderson, *Damages for Sellers Under the Code's Profit Formula,* 40 Sw. L.J. 1021, 1038 (1986).

**557**

[I]f it appears to the court that the error affects a part only of the matter in controversy and that such part is clearly separable without unfairness to the parties, the judgment shall be reversed and a new trial ordered as to that part affected by such error, *provided that a separate trial on unliquidated damages alone shall not be ordered if liability issues are contested.*

Because liability issues were contested in the trial court, and because damages are unliquidated, we cannot remand as to damages only. *A.B.F. Freight Systems v. Austrian Import,* 798 S.W.2d 606, 617 (Tex. App.—Amarillo 1990, writ denied); *Little Darling Corp. v. Ald, Inc.,* 566 S.W.2d 347, 350 (Tex.Civ.App.—Dallas 1978, no writ); TEX.R.APP.P. 81(b)(1); *see also Gill Savings Ass'n v. Chair King, Inc.,* 797 S.W.2d 31, 33 (Tex.1990) (judgment of court of appeals upholding liability finding but reversing and remanding damage award affirmed where TEX.R.APP.P. 81(b)(1) was not raised in motion for rehearing or on application to the Texas Supreme Court).

The judgment is reversed and the entire case is remanded for a new trial.