**In re EL PASO REFINERY, L.P., Debtors.**

**Bankruptcy No. 94–30051–C.**

United States Bankruptcy Court, W.D. Texas, El Paso Division.

April 15, 1998.

Kyung S. Lee, Verner, Liipfert, Bernard, McPherson and Hand, Chartered, Houston, TX, for Chapter 7 Trustee.

Peter J. Riley, G. Martin Green, Thompson & Knight, Dallas, TX, for UOP.

***DECISION ON OBJECTION OF TRUSTEE TO CLAIM [# 887] OF UNITED STATES OF AMERICA, DEFENSE FUEL SUPPLY CENTER***

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the objection of Andrew B. Krafsur, Trustee, to the claim of the United States of America, on behalf of the Defense Fuel Supply Center. After hearing initial arguments, the court rejected the contention of the DFSC that it might hold an administrative priority claim. The court then heard evidence from the parties, and entertained briefing on a significant legal

issue raised by the somewhat unique procedural history of this claim. This decision now disposes of all outstanding issues.

This contested matter raises the question of the circumstances under which a non-debtor party to an executory contract can recover for an estate's post-petition non-performance of the debtor's obligations under that contract. In other words, what, if any, claim is raised in favor of the non-debtor party when the estate fails to perform the debtor's obligations post-petition? And is the answer to that question in any way altered by the fact that the non-debtor party, rather than seeking a ruling on assumption or rejection of the executory contract,[1] has instead sought and obtained an order granting relief from stay and unilaterally terminated the contract post-petition?

### *Factual Overview*

Although this bankruptcy case has a long and fascinating history, the procedural facts relevant to the matter presently under consideration are relatively simple and undisputed. The Defense Fuel Supply Center (DFSC) is the federal agency charged with procuring fuel for the nation's armed forces. DFSC contracts with various refineries to furnish product, especially jet fuel, to various military installations.[2] Prior to the October 23, 1992 filing of El Paso Refinery's Chapter 11 petition, EPR had entered into a contract (the Contract) with DFSC to provide certain quantities of jet-grade fuel to particular military installations for a date certain. The Contract included a clause providing that, upon non-performance by EPR, the DFSC contracting officer could, by written notice of default to EPR, terminate the Contract, and reprocure the fuel elsewhere, and that EPR would be liable for any reprocurement costs in excess of the Contract price. The Contract also incorporated a standard emergency power permitting DFSC to seek "cover" in the event of default, to assure that military installations counting on delivery of fuel would not be left wanting. This provision of course assures that the nation's military forces will not be left without fuel in the event of a national emergency.

Shortly after the commencement of EPR's Chapter 11 proceeding, EPR was required by court order to engage in a 75–day warm shut-down,[3] effectively suspending its operations and temporarily preventing it from supplying any of its customers. As a result, EPR informed DFSC that it would be temporarily unable to meet the terms of the Contract on a timely basis. DFSC scrambled to replace the immediate needs of the military installations which were relying on shipment within the next two weeks or so, under its emergency powers, then subsequently sought and received relief from the stay in order to formally terminate its contract with EPR and to pursue an administrative judgment against EPR for breach of the Contract. Later, DFSC timely filed a proof of claim for the excess costs incurred in reprocurement, basing its claim not on rejection of the executory contract, but instead on EPR's post-petition breach and the remedies

---

1. Neither party disputes whether the contract is indeed "executory" within the purview of section 365. The court's own evaluation of the contract in question satisfies the court that, regardless the imprecision of the contours of what makes a contract executory, this particular contract falls well within the boundaries. *See* Countryman, *Executory Contracts in Bankruptcy*, 57 MINN L.REV. 439 (1973); Jay L. Westbrook, *A Functional Analysis of Executory Contracts*, 74 MINN.L.REV. 227 (1989); Douglas W. Bordewieck, *The Postpetition, Pre–Rejection, Pre–Assumption Status of an Executory Contract*, 59 AM.BANK.L.J. 197 (1985).

2. DFSC negotiates contracts on an almost daily basis to stay abreast of the needs of military installations. These installations will apprise DFSC of their needs for the next month or so, and DFSC will solicit bids from various approved suppliers, selecting winning bids by evaluating such things as price, capability of delivery, cost of transportation, and the like.

3. This case was originally filed in the Austin Division of this district, and assigned to the Honorable Frank R. Monroe. Within the first week of the proceeding, Judge Monroe denied EPR use of cash collateral from its prepetition working capital lenders, drastically reducing EPR's cash flow and requiring the debtor to cease operating its oil refinery in El Paso. However, an oil refinery cannot simply be switched off. Because volatile materials remain in the refinery's system, a total shut-down could cause the refinery literally to explode, causing considerable mayhem. The proper procedure, referred to as a "warm shut-down," involves gradually reducing the plant's operations to a level at which it can safely lay idle.

afforded by the termination clause in the Contract.

The parties put on evidence regarding the amount of damages alleged to have been suffered by DFSC as a result of its having had to "cover" the estate's inability to perform.

We address first the legal question regarding whether DFSC even has a claim at all against the estate. If it does, then we must next determine what sort of priority (if any) the claim has against the estate. Finally, we address what the amount of that claim might be, based on the evidence presented and the legal principles applicable.

### Analysis

■ At the outset, we must determine whether DFSC even has a claim against the estate. The normal route for the nondebtor party to an executory contract to obtain and assert a claim against a bankruptcy estate is via the assumption/rejection mechanism in section 365. *See* 11 U.S.C. § 365(a); *see also* 11 U.S.C. § 502(g); *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *In re Monarch Capital Corp.*, 163 B.R. 899, 907 (Bankr.D.Mass. 1994); *United States Postal Service v. Dewey Freight System, Inc.*, 31 F.3d 620, 624–25 (8th Cir.1994). In this case, the executory contract in question was *neither* assumed *nor* rejected. Instead, DFSC obtained relief from the automatic stay, and proceeded *to terminate* the contract post-petition, based upon the estate's post-petition default. The Bankruptcy Code does not address what, if any, claim a nondebtor party who elects to terminate an executory contract later has against the bankruptcy estate.[4]

Neither party disputes the proposition established by the Fifth Circuit in *Austin Development* that "termination" and "rejection" of an executory contract are not identical concepts. *See In the Matter of Austin Development Company*, 19 F.3d 1077 (5th Cir. 1994). And both parties recognize that EPR neither rejected nor assumed the contract, and that no "deemed rejection" took place.[5] The dispute thus focuses squarely on the consequences of a creditor's choosing to seek termination in lieu of forcing the estate to the assumption/rejection choice, and the larger question whether, in reality, a non-debtor party to an executory contract should *ever* be able to obtain unilateral "termination" of an executory contract as an alternative to awaiting the estate's decision whether to assume or reject.[6]

The Bankruptcy Code expressly provides a structure for processing executory contracts in 11 U.S.C. § 365. Under § 365, the trustee may assume or reject an executory contract on behalf of the estate; the decision to assume or reject is effective upon confirmation of a plan. If the executory contract is rejected, the act of rejection is deemed to equal a breach of the contract occurring the day prior to the filing of the bankruptcy petition, and the non-debtor is given a pre-petition claim for damages arising from such a breach, measured (in the usual case) by the terms of the contract and applicable state (or federal) law. 11 U.S.C. § 502(g). *See Matter of Continental Airlines*, 981 F.2d 1450–51; *NLRB v. Bildisco and Bildisco*, 465 U.S.

---

4. A "claim" is either an obligation of the *debtor* as of the commencement of the case, or of the *estate* after the commencement of the case. *See* 11 U.S.C. §§ 101(5), 501, 503(b)(1).

5. Deemed rejection occurs only in Chapter 7. The events here transpired while this was a Chapter 11 case. By the time the case was converted to Chapter 7, the contract had long since been terminated.

6. We need here to distinguish the sort of termination which may occur as a matter of law simply because of a chain of events which was set in motion prior to the filing and is completed by the mere passage of time, from "termination" as an affirmative post-petition *remedy* pursued by the non-debtor party to the executory contract, whether in response to a pre-petition default by the debtor or a post-petition default by the estate. The law already (and readily) recognizes that a contract which falls into the first category is not a contract susceptible of either assumption or rejection in the first instance. *See Hertzberg v. Loyal American Life Ins. Co.*, 106 B.R. 131 (Bankr.E.D.Mich.1989). We are interested only in the second category of terminations, because the act of termination will, if exercised, *cut off* the estate's *ability* to either assume or reject the executory contract, effectively robbing the estate of an important choice conferred by the Bankruptcy Code on the estate's agent (the trustee) for the benefit of the estate's creditor body.

513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984).[7] If, on the other hand, the estate elects to assume the executory contract, then it takes on the burdens associated with that contract, agreeing to cure any outstanding defaults, and committing to perform on a going-forward basis. If the estate, following assumption, fails to perform, then the non-debtor party to the contract will hold a claim against the estate which enjoys administrative priority. *See* 11 U.S.C. §§ 365(g)(2)(A), 503(b), and 507(a)(1). Thus, in the usual circumstance, the non-debtor party to the contract will hold either a pre-petition unsecured claim (in the event of rejection) or a post-petition administrative priority claim (in the event of assumption).

Of course, while the assume-or-reject mechanism is the statutory device by which the non-debtor party ascertains and asserts any claim it may have against the estate arising from the debtor's pre-bankruptcy contracts, the claim is actually rooted in the moment of the debtor's petition.[8] Code § 101(5) defines as a claim any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5) (1994). The purpose of this broad definition is to ensure that the full range of the debtor's obligations are resolved in the bankruptcy proceeding.[9] Furthermore, the legislative history of the claims allowance process in 11 U.S.C. § 502 remarks that bankruptcy functions "as the acceleration of the principal amount of all claims against the debtor."[10] This comports with the pre-Code understanding of the claims of non-debtor parties to executory contracts articulated in *Central Trust Co. v. Chicago Auditorium Assoc.*, 240 U.S. 581, 592–93, 36 S.Ct. 412, 415, 60 L.Ed. 811 (1916), which held that the commencement of bankruptcy proceedings is "the equivalent of an anticipatory breach of an executory agreement." Although practice under the Code focuses on assumption-or-rejection under § 365, the conceptual structure is the same. The non-debtor party has a claim pending against the *debtor* as of the moment of the petition. It is then simply a matter of time and procedural maneuvering until the *estate*, represented by the trustee or debtor-in-possession, forces the liquidation of such a claim as a pre-petition liability by rejecting the contract, or assumes the contract and its attendant liabilities as post-petition administrative obligations of the estate. This result in turn resonates with the general purposes of the Code by allowing creditors a claim while allowing the debtor a discharge.[11]

■ This analysis would be incomplete without a consideration of whether or not a debtor's contracts pending at the time of petition become property of the estate, and courts are not in total harmony on this point. Our inclination lies with those decisions holding that executory contracts are property of the estate. *See Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687 (Bankr.S.D.N.Y.1992); *Alert Holdings, Inc. v. Interstate Protective Services, Inc.*, 148 B.R. 194, 203 (Bankr.S.D.N.Y.1992) (executory contract property of the estate); *In re Chateaugay Corp.*, 116 B.R. 887, (Bankr.

---

7. It is critical note that, contrary to some holdings, such as *In re TransAmerican Natural Gas Corp.*, 79 B.R. 663 (Bankr.S.D.Tex.1987), the rejection by the trustee is *not an avoidance* of the contract or the debtor's obligations under it. This is one misconception of the nature of rejection that has previously plagued courts engaged in bankruptcy contract analysis. *See* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection,'* 59 U.CoL.L.Rev. 845, 887–89 (1988).

8. *See* Hon. Francis G. Conrad and Olin McGill, *Exorcising Executoriness: Functionalist Arguments and Incantations to Avoid Meeting the Devil in the Woods,* in Norton's Annual Survey of Bankruptcy 1995–1996, at 158–59, hereinafter Conrad & McGill, *Exorcising Executoriness*.

9. H.R. Rep. No. 95–595, 95th Cong., 2nd sess. at 309 (1978) U.S.Code Cong. & Admin.News pp. 5963, 6266. *See also* Conrad and McGill, *Exorcising Executoriness* at 159.

10. H.R. Rep. No. 95–595, 95th Cong, 2nd sess. at 353 (1978) U.S.Code Cong. & Admin.News pp. 5693, 6308; for additional discussion of the role of the claims process, *see* Westbrook, *Functional Analysis,* 74 Minn.L.Rev. at 326–27.

11. *See* Conrad and McGill, *Exorcising Executoriness* at 154–56.

S.D.N.Y.1990) (contract rights are intangible property within the definition of the estate); *In re Computer Communications, Inc.,* 824 F.2d 725, 730 (9th Cir.1987) (contract falls within § 541 definition of property of the estate).[12] This reading is more consonant not only with the broad definition of property of the estate set out in Code § 541,[13] but also with the aforementioned broad definition of "claim" provided by Code § 101(5) and the underlying purpose of § 502 to achieve a comprehensive resolution of claims against the debtor, thus avoiding the confusion and practical problems of having such contracts dangling outside the estate and the bankruptcy proceeding.[14] A trustee's rejection of an executory contract, then, is not some special avoidance power, but simply the trustee's economic decision on behalf of the estate to breach the contract, fixing the non-debtor's claim as a pre-petition, unsecured debt for a breach arising the day before petition. Once we see that the non-debtor party has a pending claim as of the moment of the debtor's petition, and that the

executory contract is property of the estate (until rejection), we can properly understand the assume-or-reject process under § 365 not as some special bankruptcy power, but instead as the trustee's decision either to perform or to breach the contract (a decision available to any party to any contract), and as the bankruptcy mechanism under which the rights and obligations arising under the contract are adjudicated as between the non-debtor and the estate as successor to the defunct debtor's rights and liabilities.[15]

But what options are available to a non-debtor party to such a contract in the interregnum *before* the estate makes the decision to assume or reject? What room for maneuvering is available to the non-debtor party, prior to the trustee's decision to assume or reject? The decision is especially pointed when, as here, the estate does not perform its obligations under the executory contract in question, leaving the non-debtor party at a substantial risk of loss.[16] DFSC argues that,

---

12. *But see In re Lovitt,* 757 F.2d 1035, 1041 (9th Cir.1985) (executory contracts and leases do not vest in trustee as of petition date, but only upon the trustee's affirmative act of assumption); for support of this "exclusionary" view, *see* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection',* 59 Colo.L.Rev. 845, 856–65 (1988). Professor Andrew makes a good historical argument that much U.S. executory contract doctrine can be traced to the 1818 English case *Copeland v. Stephens,* in which an unexpired leasehold was held to remain in the debtor, until and unless the trustee assumed it. Andrew points out that many pre–1938 Act U.S. cases relied on *Copeland* for the proposition that a contract or lease transcended the estate unless expressly assumed, and argues that this doctrine was codified in § 70(b) of the 1938 Act and again by § 365 of the Code. However, as we discuss above, we find the contemporary shift toward an inclusionary understanding to be a more sympathetic reading of the Code. *See* Westbrook, *infra* footnote 13. Of course, we agree with *Cohen* that this reading does not subvert the purpose of the exclusionary doctrine identified by Professor Andrew, that "a bankruptcy estate does not, absent its express election, incur administrative liability on a contract of the debtor." *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687, 703 (Bankr.S.D.N.Y.1992), *citing* Andrew, *Understanding 'Rejection,'* at 21–22. Administrative liability still requires express assumption by the trustee.

13. 11 U.S.C. § 541(a)(1); *see also Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel*

*Burnham Lambert Group, Inc.*), 138 B.R. 687, 700–02 (Bankr.S.D.N.Y.1992).; *In re Chateaugay Corp.,* 116 B.R. at 898; *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983); H.R. Rep. No. 595, 95th Cong. 2nd sess. at 367 (1978) U.S.Code Cong.& Admin.News pp. 5693, 6322.

14. *See* Westbrook, *A Functional Analysis, supra,* 74 Minn. L.Rev. at 326–30.

15. Examining the instant case in this manner also allows us—requires us, in fact—to exercise a functional approach to the executory Contract. As has been noted elsewhere, the focus of the functional approach is not whether the contract is "executory," but instead whether its assumption or rejection could in any way benefit the estate. *See* Conrad and McGill, *Exorcising Executoriness* at 144–46.

16. The question is especially pointed under our facts. We do not here have a mere monetary default, a mere failure to make a payment due (as is so often the case with leases). EPR had contracted to fulfill a requirements contract. When it did not perform, it left the DFSC with no choice but to find someone else to step in and furnish product. The fuel, after all, was for aircraft presumed to be maintained in a certain state of combat readiness, and the interests of national defense are thus implicated. The non-debtor party to this particular contract thus had no choice but to incur additional damages on a post-petition basis. It is probably not correct,

in this particular case at least, it had no choice but to seek relief from stay to terminate the Contract, or else it would not have been free to re-procure fuel from other sources.[17] DFSC also maintains that, under the terms of the Contract, it could establish damages only if the Contract were first terminated. EPR, on the other hand, argues that the proper remedy for DFSC was to be found in section 365, and that, absent a rejection on EPR's part, the Bankruptcy Code affords DFSC no other mechanism by which it can establish its claim for damages.

■ According to the cases discussing this issue, the estate enjoys a rather privileged position. From the moment of filing to the moment of assumption or rejection, the non-debtor party is held to be barred from enforcing the contract and its terms. *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531–33, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984); *In re Monarch Capital Corp.*, 163 B.R. 899, 907 (Bankr.D.Mass.1994) (nondebtor party cannot terminate contract by reason of the debtor's defaults); *United States Postal Service v. Dewey Freight System, Inc.*, 31 F.3d 620, 624–25 (8th Cir.1994) (after commencement of a Chapter 11 proceeding, but before rejection or assumption of executory contracts, those contracts are enforceable by, but not against, the debtor). Of course, if the nondebtor party performs on the executory contract postpetition, it is entitled to a postpetition administrative claim for the reasonable value of such performance. *NLRB v. Bildisco & Bildisco*, 465 U.S. at 531, 104 S.Ct. at 1199; *United States Postal Service v. Dewey Freight System, Inc.*, 31 F.3d at 625.[18] Until then, however, the status of the non-debtor party's claims against the estate is held in *stasis*, pending the estate's decision. Were it otherwise, this party would

enjoy a privileged position *vis-a-vis* other creditors, able to use the estate's need for the contract to extract special treatment, even though the contract might ultimately be rejected and the creditor would thereafter have no priority over other unsecured creditors. Until the estate elects to assume the contract, with the approval of the court, and with prior notice and opportunity for hearing to other creditors, the Bankruptcy Code deems it inappropriate to accord the non-debtor party to an executory contract any special position or influence.

This court held in another case, involving a hotel seeking to reject a licensing agreement with a nationwide chain, that the non-debtor party must indeed be bound by the contract until the estate assumes or rejects, and that the non-debtors' enforcement actions prior to assumption or rejection must be barred, for reasons not dissimilar to those referenced above. *In re Gunter Hotel Associates*, 96 B.R. 696, 700 (Bankr.W.D.Tex.1988); *citing In re Wilson*, 69 B.R. 960, 965 (Bankr. N.D.Tex.1987); *In re Metro Transp. Co.*, 87 B.R. 338, 339 (Bankr.E.D.Pa.1988); *In re Feyline Presents, Inc.*, 81 B.R. 623, 626 (Bankr.D.Colo.1988). In *Gunter*, we cited Professor Douglas Bordewieck's observation that "during the period from the date of filing until the date on which the DIP rejects or assumes an executory contract, the non-debtor is bound to perform while the DIP temporarily is not bound to perform . . . [t]he rights of a party to an executory contract with the debtor are not "stayed" by section 362; those rights are rendered temporarily unenforceable by section 365." Bordewieck, *The Postpetition, Pre–Rejection, Pre–Assumption Status of an Executory Contract,* 59 Am.Bankr.L.J. 197, 200, 214 (Summer, 1985). This court ratified its holding in *Gunter* in a later decision, *Krafsur v. UOP*, one

---

however, that termination was essential to DFSC's protecting its interests.

**17.** The argument lacks real force however. Reprocurement cannot realistically be construed as a violation of the automatic stay, as it would not constitute an effort at collection, nor would it necessarily eviscerate the estate's ability to later assume the contract (except, perhaps, by virtue of the reprocurement creating such a large "cure" item that the estate would be unable to effectuate the cure).

**18.** Courts have also held that, to be entitled to an administrative claim, the non-debtor party will also have to establish that the service for which payment is sought "benefitted" the estate. *See United States Postal Service v. Dewey Freight System, Inc.*, 31 F.3d 620, 624 (8th Cir.1994); *NLRB v. Bildisco & Bildisco*, 465 U.S. at 531, 104 S.Ct. at 1199.

arising out of this bankruptcy case, stating once again that, pending assumption or rejection by the estate, the non-debtor party to an executory contract is bound by terms of the contract: "[T]he Code places an independent duty on the non-debtor to continue the performance of an executory contract until it is assumed or rejected ... Whether the debtor performs or not, the non-debtor must perform until assumption or rejection." *Krafsur v. UOP (In re El Paso Refinery, L.P.),* 196 B.R. 58, 72 (Bankr.W.D.Tex.1996).

Nor is this the only court to reach this conclusion. The First Circuit ruled similarly in *Public Service Company of New Hampshire,* a case involving an electric supply contract between two utility companies, one of which was the debtor. *In re Public Service Co. of New Hampshire,* 884 F.2d 11 (1st Cir.1989). As of the petition date, the non-debtor utility owed the debtor for electricity purchased pre-petition. The non-debtor sought to retain these funds as an offset against damages that would potentially result from a separate contract. The First Circuit observed that "[t]he Bankruptcy Code prescribes a set course of treatment for executory contracts... Ordinarily, the debtor need not commit itself to assumption or rejection of such a contract until a reorganization plan is confirmed... Parties who wish to know where they stand may, pursuant to 11 U.S.C. § 365(d)(2), seek to compel an early election.... But ... [t]he interests of the creditors collectively and the bankrupt estate as a whole will not yield easily to the convenience or advantage of one creditor out of many." *Id.,* at 14–15. Acknowledging that the debtor had neither assumed nor rejected, and that the non-debtor had not moved for a determination, the court affirmed the lower court's finding that the non-debtor party had no claim against the estate against which to claim an offset. *Id.* The First Circuit recognized that § 365 operates primarily to facilitate the debtor's rehabilitation while still affording the non-debtor party the ability to protect its interests, essentially providing the exclusive mechanism for resolving executory contract issues. *See also NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 528, 104 S.Ct.

1188, 1197, 79 L.Ed.2d 482 (1984); *In re Silk Plants, Etc. Franchise Systems, Inc.,* 100 B.R. 360, 362 (M.D.Tenn.1989); *citing Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1310 (5th Cir.1985) and *In re Jolly,* 574 F.2d 349, 351 (6th Cir.1978).

By limiting the non-debtor party to the § 365 remedies, the value of the executory contract can be preserved for the estate, while allowing the estate an appropriate period of time to evaluate its options. If the contract is terminated at the request (or behest) of the non-debtor party, then the estate's options are literally foreclosed, undermining the structure and intent of the drafters of the Code. A party to an executory contract has no more right to "relief from stay" to "terminate" a contract with the estate than does any other unsecured creditor whose contract (executory or not) has been breached.

Indeed, when one thinks about it, the "relief from stay" option is not a true alternative to the assumption or rejection choice framed by § 365 in any event. At the hearing on such a motion, the non-debtor party must establish "cause" for relief from stay, *see* 11 U.S.C. § 362(d)(1),[19] whereupon the estate must offer "adequate protection" to the petitioning creditor, *see* 11 U.S.C. § 362(e). What "cause" can the non-debtor party offer in the usual executory contract situation, other than a failure of performance on the part of either the pre-petition debtor or the post-petition estate? And if the "cause" in question is the "pre-petition breach" by the debtor, then no more cause has been shown than could be mustered by any unsecured creditor. Unsecured creditors cannot obtain relief from stay to pursue their claims against either the estate or the debtor based solely upon the existence of an outstanding pre-petition default which remains unsatisfied. *See In re U.S. Brass Corp.,* 173 B.R. 1000, 1006 (Bankr.E.D.Tex.1994) (relief from stay granted to unsecured creditor only when "balance of hardships" tips in creditor's favor; the most important factor in such deter-

---

**19.** Section 362(d)(2) does not apply in the executory contract context (though it might conceivably apply in the lease context), because no property interest is at risk.

mination is impact on the administration of the estate).

A post-petition breach, by contrast, might afford sufficient "cause" to warrant the court's intervention, but the correct form of adequate protection to be offered by the estate in every executory contract case will always be an offer to assume or reject the executory contract by a date certain. The reasoning is simple. If the estate decides to *reject* the contract, then any outstanding defaults, including those generated post-petition, will be converted into a pre-petition unsecured claim, equal in priority of distribution with other unsecured creditors—that is, after all, what the Bankruptcy Code already provides with respect to the treatment of non-debtor parties to executory contracts with which the estate decides not further to proceed. If, on the other hand, the estate decides to *assume* the contract, then the outstanding default will, of necessity, be cured, by the terms of § 365(b), and affords the non-debtor party a priority of payment in the event the cure is not done, or in the event there is a later post-assumption breach of the contract. In short, the "adequate protection" to which the non-debtor party to an executory contract might be entitled in the context of a lift stay action is precisely the same as the relief already contemplated by § 365(a).[20]

As we discussed above, the estate has what amounts to a property interest in all of its executory contracts (indeed, in all of its contracts). Each party to an executory contract has a property interest, consisting of the collection of rights and remedies which flow from that contract. Bankruptcy intervenes to affect the property rights of the non-debtor party, just as it intervenes to affect the rights of *all* unsecured creditors with claims against the estate (and all creditors, after all, have a property interest consisting of their claims against the estate, property rights which give rise to their right to due process in the treatment of their interests *vis-a-vis* the estate). By the same token, the estate succeeds to the property rights which the debtor held in the same contract, and those property rights must be preserved for the benefit of all creditors of the estate. Permitting a "termination" of such contracts would effectively allow the elimination of a property interest of value to the estate. Affording the same remedy to the non-debtor party is no more necessary than it would be for any other unsecured creditor of the estate. That party of course has a strong interest in assuring that, if it is forced to, in effect, extend credit to the estate by continuing to perform on the contract post-petition, it have an administrative claim for the resulting benefit conferred on the estate—and case law recognizes the right of the party to recoup an administrative claim from the estate equal to the value of that benefit so conferred. *See United States Postal Service v. Dewey Freight System, Inc.,* 31 F.3d 620, 624 (8th Cir.1994); *NLRB v. Bildisco & Bildisco,* 465 U.S. at 531, 104 S.Ct. at 1199. Termination is not a necessary remedy for the non-debtor party, given this protection, and is especially inappropriate given the adverse impact that termination would have on the estate's property interest in the contract. This analysis too, then, supports the conclusion that termination is not an appropriate remedy in the context of executory contracts.

---

**20.** Section 365(e) expressly abrogates the effectiveness of contractual "ipso facto" clauses in the bankruptcy context. Thus, the non-debtor party's pointing to the presence of such a clause in the contract will not, in the usual case, satisfy the "cause" standard of § 362(d)(1). The exception, recognized by a number of courts, are the so-called "financial accommodation" cases, which recognize that certain kinds of contracts which might otherwise be classified as executory are nonetheless incapable of assumption by the estate, so that termination might be a legitimate remedy for the non-debtor party to the contract, provided the creditor first seeks relief from stay. *See* 11 U.S.C. § 365(e); *In re Wegner Farms Co.,* 49 B.R. 440 (Bankr.N.D.Iowa 1985) (concluding that Congress did not intend to exempt actions to terminate a surety bond from the automatic stay, and that bringing such contracts within the scope of the stay ensures that the decision that an executory contract may be terminated comes within the proper forum after briefing and a hearing; motion to lift stay was thus held to be a prerequisite for such unilateral termination by the non-debtor.); *In the Matter of Edwards Mobile Home Sales, Inc.,* 119 B.R. 857 (Bankr. M.D.Fla.1990) (also involving a surety contract, cites *Wegner* in holding that a motion to lift stay is a prerequisite to unilateral termination).

The only express provisions in § 365 for the termination of executory contracts by a non-debtor party relate to the purchaser of an interest in a timeshare project, a vendee of real property, or the licensee from the debtor of intellectual property. 11 U.S.C. §§ 365(h), (i), and (n); In the Matter of Austin Development Company, 19 F.3d 1077, 1082 (5th Cir.1994). Relief from stay to accomplish such terminations might be entirely appropriate, but the contract at issue in this case is not, of course, one involving a timeshare project, or a vendee of real property, or intellectual property. What is more, in each of these Code-contemplated termination situations, the preliminary step to termination is the estate's decision to reject. Termination in these cases is viewed as an essential follow-along remedy for certain kinds of creditors whose contracts are rejected by the estate. It is not viewed as an alternative remedy to be invoked unilaterally by the non-debtor party to the contract, regardless of the estate's decision to assume or reject.[21] We do not find, therefore, in the Code itself any provision for termination as an alternative to the assumption/rejection mechanism for handling executory contracts.

The Fifth Circuit does at least superficially seem to recognize an "alternative" to the assumption/rejection motif of § 365, one expressed in both Continental Airlines and Austin Development. The court in both cases discusses what consequences would flow from a "termination" of the contract in question. It is not certain, however, that the Fifth Circuit has in fact sanctioned the use of such an "alternative," at least not from the holdings of these two cases. In Continental, the court compared the consequences of a rejection with a termination which would have flowed from events set in motion pre-petition, when all that needs to occur to accomplish the termination is the passage of time. Austin Development spoke of what the measure of damages might be in the event of a termination, without in fact holding that such an alternative would actually be available. In the Matter of Austin Development Company, 19 F.3d at 1082 ("If rejection were deemed a complete, immediate termination, it is not clear what the measure of the creditor's claim would be"). The most that might be gleaned from these authorities is that, if, for some reason (such as a termination set in motion by pre-petition events, for example), an executory contract were terminated post-petition, then the non-debtor party would not hold a claim for damages at all, but would instead be entirely free of the estate, because termination would simply remove the contract and its attendant obligations from existence, discharging both parties from subsequent performance.

■ Thus, if an executory contract is terminated during the course of a bankruptcy case, then the analysis of the non-debtor party's subsequent status vis-a-vis the estate could be that it has been absolved from performing its own affirmative duties under the contract, but by the same token the estate will have been absolved from liability for any damages claim to the non-debtor party. Circumventing the structure of § 365 thus has its price—the non-debtor party to the executory contract will, in the usual case, forego any claim it might otherwise have had against the estate. With the contract neither assumed nor rejected, the estate cannot be said to be obligated for either a pre-petition unsecured claim (which claim could only arise in the event of rejection) or for a post-petition administrative claim (for which the estate could be liable only in the event of an assumption). At most, the non-debtor party might conceivably hold a claim for any post-

---

**21.** This analysis is consistent with the specialized protections which Congress enacted for non-residential shopping center leases in 1984. See 11 U.S.C. § 365(d)(3), (4). Congress felt it necessary to enact a specialized provision directing the estate to perform post-petition, precisely because, absent such a provision, the estate would not be obligated to perform post-petition until the contract was assumed. See Bildisco & Bildisco, 465 U.S. at 522, 104 S.Ct. at 1194. If the estate fails to perform, then relief from stay would be entirely appropriate. What is more, upon the deemed rejection of such contracts, the non-debtor party is expressly relieved from what would otherwise be the necessary next step of seeking relief from stay to obtain possession of the property, because the statute expressly directs surrender of the property. It is worth noting that, even in this specialized section of § 365, the Code does not speak of termination of the executory contract or lease.

petition benefit conferred on the estate prior to termination, for which the estate might properly be liable under § 503(b)(1)(A). Absent a showing of such a benefit, however, the non-debtor party who successfully obtains termination of the executory contract by the course followed here by DFSC should have no claim against the bankruptcy estate.[22]

█ The analysis would end here, but for the fact that, in this particular case, it appears[23] that the court, when it granted relief from stay, did not intend to relegate DFSC to the mere termination of the contract without recourse against the estate. The terms of the Contract afford one of the reasons for this conclusion. DFSC by contract evidently had no alternative to obtaining a claim against EPR absent a "termination" of the Contract.[24] DFSC could only recoup its "cover" costs if it first obtained termination of the contract. Absent termination, the terms of the contract itself fail to afford DFSC a means by which to crystallize a

claim against the debtor, and, by extension, the estate.[25]

The risk allocation regime provided in 11 U.S.C. § 365 thus interacts with the risk allocation scheme in this particular Contract in a rather surprising and unexpected fashion, requiring a closer examination of the circumstances surrounding the motion and subsequent relief accorded to DFSC. *See In re Public Service Company of New Hampshire*, 884 F.2d at 15–16. To understand this better, it is helpful to consider a hypothetical scenario, under which EPR is presumed to have in fact rejected the Contract. The rejection would be deemed a breach occurring the day prior to the filing of the bankruptcy petition, but would not result in a termination of the Contract. *See Continental Airlines, supra* at 1460. For the measure of damages from the deemed breach, the court would then look to the terms of the underlying Contract. Presumably, the deemed breach would be treated as a "default" under the Contract Paragraph Ill(a). In order to establish damages under Paragraph Ill(b),

---

**22.** Parties to executory contracts presumably bargain for just such a result prior to bankruptcy. In many contracts, termination is an alternative remedy to holding the party liable for damages, as it relieves the party seeking termination from further obligations to perform on the contract, albeit at the cost of foregoing the recovery of damages from the other party. If, on the other hand, a party intends to "hold" the other party to the terms of such a contract, then the contract should *not* be terminated. Instead, the party should sue for breach of the contract, with the terms of the contract itself controlling the measure of damages. *See, e.g., Humphrey v. Camelot Retirement Community*, 893 S.W.2d 55, 57 (Tex.App.—Corpus Christi 1994).

**23.** The court says "appears" here because, it will be recalled, this case was originally assigned to my colleague, Bankruptcy Judge Frank R. Monroe. The undersigned judge has attempted to glean from the papers previously filed in this case, as well as from the orders entered by Judge Monroe, what Judge Monroe sought to accomplish. It is of course, the task of any judge to interpret the prior orders of another judge, a task which is viewed primarily as a question of law. This court has not conferred with Judge Monroe regarding his intentions, and such a consultation would, in this court's view, be entirely inappropriate, a view which I am confident my colleague Judge Monroe shares.

**24.** The DFSC–EPR Contract provides in relevant part:

(a) The Government may...by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances...

(b) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, provided that the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.
Contract, at ¶ 111.02(a) & (b).

**25.** Recall that, in *Continental Airlines*, the Fifth Circuit pointed out that, even though a contract is rejected, the measure of damages for the resulting claim is still to be determined by reference to the contract's terms, because rejection does not terminate or eliminate the contract. *See Continental Airlines, supra* at 1459–1460. With regard to the Contract *sub judice*, then, a party might legitimately maintain that, absent termination, the non-debtor party to the contract, upon rejection, would still have no claim because the contract itself permits a claim only in the event of termination (and rejection does not equal termination).

the DFSC would still have been required to seek relief from stay, pursuant to § 362, because the pursuit of such an action could otherwise be construed as a violation of the automatic stay. *See* 11 U.S.C. § 362(a)(1), (3). As it happens, DFSC in fact *did* move to seek relief from the stay in order to terminate, engage in reprocurement, and establish its damages for cover, albeit before EPR had made the decision whether to assume or reject. The specific termination clause in this Contract was conditioned upon a default, and termination was in turn a necessary prerequisite to establishing DFSC's damages.[26]

We thus face a conundrum. How ought we to characterize DFSC's "claim," given that the Contract was neither assumed nor rejected? True enough, we might accord the claim priority status to the extent of actual benefit to the estate, but no benefit was present here.[27] DFSC found itself confronted with a Hobson's choice. The triggering event for recovering damages was termination, but the triggering event for termination was a default. In this case, the first and only default occurred post-petition, and prior to any assumption or rejection by EPR of the executory contract. At the time DFSC moved to lift the stay, EPR was still in a position to assume or reject the Contract, and the bankruptcy court was aware of this option. At the same time, the court was also conscious of the situation in which DFSC

found itself, being forced by interests of national security to provide "cover," and unable by the terms of that very Contract to recoup those cover costs unless it obtained contract termination. The options available were thus as follows: (1) the Trustee could move to assume or reject the Contract immediately; (2) the court could require DFSC to file a motion to compel the Trustee to assume or to reject; (3) the court could *sua sponte* set a deadline for the estate to either assume or reject the Contract; or (4) the court could simply lift the stay and allow DFSC to proceed with termination under its Contract, deferring until a later date the question regarding what, if any, damages claim DFSC might hold as a result.

The bankruptcy court was certainly aware at the time the motion came up for hearing that the estate had raised the assumption/rejection argument, so both the court and DFSC would have been aware of the procedural posture of the case, and, more importantly perhaps, cognizant of the realities governing the potential burdens and benefits to the estate of assumption or rejection. One way to characterize the court's decision lifting the stay is that the court in effect set a deadline for the estate to either assume or reject the Contract. After all, lifting the stay certainly did not prevent the estate from subsequently filing a motion either to assume or to reject the Contract.[28] It most certainly

26. Interestingly, had the estate elected to assume the Contract, there is an open question whether DFSC would have had a "cure" claim, because the Contract appears to have afforded a remedy in damages only if the Contract was first terminated. If the court had approved assumption of the Contract, termination would not have been permitted, of course.

27. At trial, the United States was forced to acknowledge that their sole basis for urging an entitlement to a priority claim was their reliance on *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751. The court at hearing rejected that argument, noting that the bulk of that Supreme Court decision has since been codified in 28 U.S.C. § 959, which requires an estate to abide by applicable state law notwithstanding the bankruptcy filing, *i.e.*, no unwarranted competitive advantage is to be conferred by filing. Executory contracts fall outside the purview of that provision (and outside of *Reading Co.*, for that matter) because of their special place in the bankruptcy universe, as set out in

section 365. The DFSC did not seriously argue that any particular *benefit* had been conferred on the *estate* by DFSC's decision to pursue cover. The benefit was conferred on the military bases who were relying on the fuel supplies that DFSC arranged on an emergency basis. The test, however, is not benefit to the creditor, or benefit to a third party, but *rather* benefit to the *estate*.

28. It is true that, as a practical matter, rejection was the most likely choice to made by an estate whose access to cash collateral had been cut off by the court. However, the estate technically could also have assumed the Contract—despite the restrictions on assignment of government contracts, an assumption by the estate would not be such a proscribed transfer. *See Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir.1997) *cert. denied*, —— U.S. ——, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997); *In re Hartec Enters., Inc.*, 117 B.R. 865 (Bankr.W.D.Tex. 1990). Thus it is not correct, as the United States has argued, that rejection was the only option available to the estate.

set a deadline, however. If the estate failed to move quickly, the nonbankruptcy termination process would quickly foreclose the estate's options. The court would certainly have been aware that termination was DFSC's only means for setting a claim for its cover damages, as the Contract was attached to the motion for relief. The court would have been equally aware that the termination process was somewhat lengthy, affording the estate some time to accomplish assumption or rejection before the termination was accomplished in the non-bankruptcy forum. Perhaps the court intended to put DFSC to an election of remedies, but the more likely scenario is that the court intended to place a deadline on the estate to either assume the Contract, or to have it deemed rejected.

The court recognizes the danger posed by this analysis: it seemingly allows the non-debtor party to an executory contract not only to circumvent the remedy structure of § 365(a), (b)(1), and (d), but also to undermine in substance the § 365(e) proscription against contractual clauses providing for the termination of an executory contract due to the financial condition of the debtor or the filing of a petition under Title 11. By validating DFSC's maneuvers here, we risk creating a mechanism by which a party could bargain at the contract negotiation stage for a clause that provides for termination plus damages upon default (without mentioning insolvency). Such a clause might afford a stronger "cause" element for relief from stay (termination is required in order to "set" the rejection claim).

The argument also puts the cart before the horse, however. After all, a party can as easily move for relief from stay to terminate *after* rejection of the contract. The "cause" argument at the lift stay stage is no stronger, because, again, the response will always be (or should be), a deadline for assumption or rejection of the contract. Moreover, even if a motion to lift stay may be an awkward way for the non-debtor to commence enforcement of the debtor's contract, decision on the motion is still soundly within the court's province. By focusing on two of the basic principles of a functional approach to executory contracts, first that the contracts are property of the estate and second that the litmus test for resolving questions as to such contracts is the extent to which their breach or performance would benefit or burden the estate, the court will be able to gauge whether lifting the stay is appropriate at a given juncture in the proceeding.

Our decision here is also complicated by the procedural disposition of this matter. Had the stay not been lifted, DFSC presumably would have had to seek a remedy properly through § 365, or simply grin and bear it.[29] We do not ignore the burden this would have placed on DFSC, but we hasten to acknowledge that this is the allocation of burden or commercial risk envisioned by § 365 and its associated doctrine developed in the caselaw. By the same token, there is nothing particularly scandalous about DFSC's pursuing a remedy under the terms of the Contract. This presents the court with the dilemma of fashioning a decision that considers both DFSC's expectations under the Contract and the Contract Disputes Act (once the stay was lifted) and the integrity of § 365 for future cases (not to mention

---

**29.** We were at first tempted to treat this problem primarily as a question of the election of remedies, by holding that, if the non-debtor party does not wish to engage in the § 365 process and chooses instead simply to lift the stay and terminate the executory contract, the non-debtor has elected to opt out of the bankruptcy process altogether and to forego any of the remedies provided by the Bankruptcy Code. This would be more consonant with the general concept of contract termination, by which both parties are discharged from any obligations under the contract and simply part ways. This would allow the impatient non-debtor the option of disentangling itself from the bankruptcy and the § 365 process, while protecting the debtor from any claim arising from non-performance of the executory contract. However, there are two problems with this notion, one general and the other particular to this case. The first problem is that such a characterization deprives the debtor-in-possession of the full benefit of § 365, which is to take time to deliberate over whether to assume or reject a contract which may be advantageous to the estate. The second is that, because the termination clause in the EPR–DFSC Contract includes a provision for excess reprocurement costs, it does not simply call for the DFSC to pick up its marbles and go home. Instead, we must address and characterize DFSC's claim for damages arising from DFSC's invocation of this somewhat awkward termination-plus provision.

EPR's expectations under the bankruptcy regime). Although the preferred course of action for DFSC would have been through § 365, it would be inappropriate to deny DFSC any remedy for proceeding as it did once the stay was lifted, given that the bankruptcy court seems already to have taken these issues into consideration when it granted relief from stay. To so deny DFSC would elevate form over substance in a manner that ignores the uncomfortable positions of *both* parties at the time the stay was lifted and ignores the express terms of the underlying contract.

Therefore, for the purposes of this case, we hold that, by terminating the stay, the court set a *de facto* deadline for assumption or rejection of the Contract, affording the estate a short period of time (*i.e.* up until the conclusion of the termination process spelled out in the Contract) within which to either assume or reject the Contract, while at the same time assuring DFSC a pre-petition unsecured claim for damages (via a deemed rejection) under the Contract in the event the estate failed to take any action.[30] With this conclusion in hand, we must turn then to a determination of the allowed amount of the unsecured claim which DFSC holds against the estate.

### Damages

■ ▆ The underlying DFSC–EPR Contract for fuel procurement provides:

> (b) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, provided that the Contractor shall continue the perfor-

mance of this contract to the extent not terminated under the provisions of this clause.

Contract, at ¶ I11.02(b). As it happens, this is largely the same measure of damages provided for under Texas Business & Commerce Code § 2.712, the Texas statutory cognate to the Uniform Commercial Code's § 2.712, which provides the measure of damages for a buyer's "cover" in the event of a seller's breach of a sales contract.

▆ The general purpose of damages for breach of contract is to put the plaintiff in the economic position he or she would have been in had the contract been properly performed. *Krafsur v. UOP (In re El Paso Refinery, L.P.)*, 196 B.R. 58, 64 (Bankr. W.D.Tex.1996). A party seeking damages for breach of contract must prove with reasonable certainty the damages allegedly occurring. *El Paso Natural Gas Co. v. Minco Oil & Gas Co.*, 958 S.W.2d 889, 904 (Tex. App.—Amarillo 1997); *see also Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.*, 814 S.W.2d 553, 556 (Tex.App.—Hous.[1st Dist.] 1991, no writ). But reasonable certainty does not mean mathematical exactitude. *Id.*

When EPR was unable to perform on the Contract, DFSC was required to terminate the Contract and reprocure from other sellers the fuel needed by various military installations. At the hearing, we learned from Norma McGuire, a contracting officer with the DFSC, that because reprocurement is done on a shorter time-line than the normal fuel procurement bidding and contracting process, the price per gallon of the reprocured fuel was in many instances higher than the prices provided in the EPR Contract.[31] However, the Trustee disputed many of the excess costs on the grounds of inadequate documentation. Specifically, our attention was drawn to (1) the excess costs of repro-

---

**30.** We emphasize, however, that in future cases, the more elegant procedure for addressing the debtor's prepetition contracts will be found under 11 U.S.C. § 365, and that the proper role for this court in such matters will be in overseeing the "breathing space" afforded by § 365 and its relevant caselaw, a space in which the debtor enjoys a decisively privileged position, and not in policing a hybrid process that involves flanking maneuvers against executory contracts via a § 362 motion to modify the stay.

**31.** McGuire indicated that the normal time line for bidding on such contracts can be up to seven months, while emergency reprocurement bidding may occur over a period as short as two to three weeks.

curement from Navajo Refining Company ("Navajo") for December of 1992; (2) undocumented excess transportation costs; (3) the excess costs of reprocurement from Chevron; and (4) certain undocumented excess reprocurement costs.

As for the reprocurement from Navajo, the Trustee questioned excess costs for November and December of 1992, specifically the sum of $123,746.39 as an excess cost for 2,180,169 gallons of fuel delivered to Roswell, New Mexico. McGuire explained that this purchase was made pursuant to a modification of the DFSC's contract with Navajo for providing fuel to Cannon Air Force Base after El Paso Refinery became unable to deliver to Roswell. Apparently, Cannon needed less fuel than anticipated at that time, while the Roswell facility faced a shortfall as a result of EPR's inability to perform. So DFSC modified the contract with Navajo to divert up to 2,300,000 gallons of fuel to Roswell, instead, leading to the additional costs. We take these additional costs to be supported by the evidence and to be adequately justified by the DFSC. While the argument may be made that Navajo was already obligated under the original contract to provide this fuel, we conclude that the additional cost was justified by the contract modification and diversion of fuel from one point of delivery to another.

With regard to the excess transportation costs, the DFSC has sought $425,468.86. The Trustee, however, has pointed out that only $252,841 of those excess transportation costs are supported by documentation, and the DFSC acknowledges this lack of evidence. Accordingly, we cannot conclude that the entire $425,468.86 in excess transportation expenses asserted by the DFSC have been established with sufficient certainty, and will allow instead the $252,841 that is documented.

With regard to reprocurement from Chevron, the Trustee scrutinized reprocurement of 9,250,000 gallons for Luke Air Force Base ("Luke") at a contract price of slightly over $0.62 a gallon, when Luke was also receiving quantities of fuel from Giant Industries Arizona, Inc. ("Giant") and Navajo at $0.58 and $0.59 a gallon respectively. The DFSC's witness Ms. McGuire explained that the reason the DFSC contracted for this amount with Chevron was that, at the time the emergency reprocurement was made, Luke had a projected need of 33,000,000 gallons, while Navajo had only 16,884,000 available and Giant only 6,880,000 available to commit to sell. The Trustee counters that the DFSC had already contracted with Navajo for 61,000,000 gallons for its requirements that year, but left approximately 10,000,000 gallons under that contract unused, and asks why DFSC did not simply draw down Luke's additional needs under the existing Navajo arrangement. McGuire explained that the volumes initially solicited in the contracts (i.e. the 61,000,000 in the Navajo contract) are estimates, and that excess amounts cannot always be diverted from one delivery point to another (as in the diversion of 2,300,000 gallons from Cannon to Roswell discussed above).[32] Additionally, while the contract amounts are estimates, the DFSC is required to draw a minimum amount on each contract. Therefore, according to McGuire, Chevron could have insisted on delivery of at least 75% of the contract amount, or sued for breach. Finally, given the vicissitudes of fuel procurement on such a large scale, especially in the short-term, emergency procurement context in which the DFSC found itself, it is not surprising that the DFSC purchases that, in retrospect, look sub-optimal. In light of this, we conclude that the disputed reprocurement from Chevron was reasonable and is adequately supported by the evidence.

Finally, the Trustee has drawn our attention to $66,199 of undocumented excess costs for reprocurement deliveries from Navajo of 1,764,000 gallons on July 18, 1993, and 1,134,000 gallons on August 25, 1993. The Trustee is correct in pointing out that the actual receiving report for the July 18, 1993 shipment and the invoice for the August 25, 1993 shipment are missing. While we do not suspect anything untoward, we point out that

---

**32.** Moreover, given the excess costs that may arise from a contract modification and diversion as discussed above, it is not entirely clear that a diversion of any "slack" remaining in the Navajo contract would necessarily have been a lower cost alternative.

such a gap in the documentation would probably not withstand the scrutiny of an internal government audit. And since we are dealing here with a government procurement agency, we think that it is appropriate to hold them to such a standard. Accordingly, we find that the documentation that the DFSC has placed on record is insufficient to support the excess costs associated with these two shipments, and disallow $66,199 of the DFSC's claim for excess reprocurement costs.

In summary, we will disallow the $172,-627.86 of the excess transport costs and $66,-199 of the excess fuel reprocurement costs sought by DFSC. This leaves $252,841 for excess transportation plus $1,663,331.18 for excess reprocurement, for a total of $1,916,-172.18 to be allowed as a general unsecured claim.

**So ORDERED.**